UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

DEMETRIA Y. BROWN,                          )
                                            )
                  Plaintiff,                )
                                            )
          v.                                )          No. 1:19-cv-02336-SEB-MJD
                                            )
PHILIP ROBINETT Officer,                    )
                                            )
                  Defendant.                )

**ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

On June 11, 2019, Plaintiff Demetria Y. Brown initiated this civil rights lawsuit

against Defendant Philip Robinett, a police officer serving as a member of the

Indianapolis Metropolitan Police Department. Ms. Brown alleges that Officer Robinett

violated her rights under the First and Fourth Amendments to the United States

Constitution. Now before the Court is Officer Robinett's Motion for Summary Judgment

[Dkt. 47]. For the reasons set forth herein, this motion is **granted.**

**Facts**

The following facts are undisputed between the parties.

Officer Robinett was on duty and engaged in training a new police officer on the

morning of February 26, 2019, when an all-channels police radio broadcast announced

that a person had been shot in the intersection of 46th Street and Arlington Avenue on

Indianapolis's northeast side. [Robinett Depo, at p. 6]. As Officer Robinett and his trainee

began traveling toward the location of the shooting, Officer Robinett received additional

radio notice that officers at the scene had requested immediate assistance and all

1

available officers should "rush" (that is, to travel with emergency lights and sirens activated) to 46th and Arlington Avenue. [*Id.* at p. 7, lines 10-21; Ex. 3, at 5:12-5:34]. Officer Robinett complied with that directive, and as he traveled, he learned that a traffic accident had occurred in conjunction with the shooting and that the suspect was running loose in the surrounding neighborhood. The suspect ultimately was apprehended at 46th & Emerson Avenue, an intersection located less than a mile from where the police officers had originally been directed, so Officer Robinett headed to that area immediately [Robinett Depo. at p. 7-8].

Following his arrival at 46th and Emerson Avenue, Officer Robinett observed law enforcement officers handcuffing a suspect who appeared to have experienced significant trauma. Firefighters and emergency medical personnel were present and attempting to assist and treat the suspect, though their aid was met by the suspect's resistance. Because all efforts were focused on preserving the life of the suspect, a crime scene perimeter had not yet been erected. [*Id.* at 8; Robinett Interrogatory Resp. at p. 7].

Meanwhile, Ms. Demetria Brown, a home healthcare worker, was leaving a patient's home located near the intersection of East 46th Street and Emerson Avenue. Ms. Brown's daughter, Ms. Asia Lipscomb, had arrived in her car to pick up Ms. Brown from her job, and the two proceeded in an effort to exit the client's neighborhood. As Ms. Brown and Ms. Lipscomb approached East 46th Street on the looped road running through the client's neighborhood and attempted to drive out of the area, their way was blocked by parked police cars displaying their emergency lights, signaling their on duty status at the scene. Ms. Lipscomb attempted to exit the neighborhood from another

outlet, but discovered it was also blocked as well with police vehicles and emergency workers. At that point, the women noticed the suspect lying on the ground. Ms. Lipscomb parked her car approximately ten car lengths from the intersection of East 46th Street and Emerson Avenue, and both women got out of their vehicle and walked toward the scene where the suspect was lying, all the while recording videos on their smartphones.[1] [Pl. Des. Evid., at p. 36-45].

As paramedics administered medical care to the suspect,[2] Officer Robinett observed Ms. Brown and Ms. Lipscomb approaching the location and, though Officer Robinett has testified that he was concerned when he first noticed their arrival that they may have walked into the crime scene, he did not approach to speak to them at that time. [Robinett Depo., p. 9-10; Robinett Interrogatory Resp., p. 7].

Another police officer, however, (whose name remains unknown to us) commented that he was going to request that Ms. Brown and Ms. Lipscomb "back up" to allow the other officers to continue their efforts to identify and secure the crime scene. [Robinett Depo., p 11]. When this (unidentified) officer approached Ms. Brown and Ms. Lipscomb, they told him they "ha[d] a right" to be there and were "not doing anything illegal." The officer informed them that they were standing inside the crime scene and

---

[1] The majority of the police encounter at issue in this litigation was captured on Ms. Brown and Ms. Lipscomb's recordings. We cite to these recordings as "Brown Video" and "Lipscomb Video," respectively.
[2] Ms. Brown has testified that she was concerned that no care was being provided to the injured man. However, this statement is plainly contradicted by the video evidence, which shows several firefighters and emergency medical personnel surrounding the man on the ground and administering medical care. [*See generally* Brown video, Lipscomb video].

that they thus needed to "go back." Ms. Brown responded, saying "they don't want us to see what's going on with him." The officer replied, "They don't want you to see what is going on period because this is a crime scene." Ms. Brown rejoined that it was "against the law to make [them] move." [Brown Video, at 0:23-0:42].

During this exchange between Ms. Brown and the unidentified police officer, a second officer, Officer Doug Correll, approached to ask whether Ms. Brown had captured on her video the incident leading to the suspect's injuries. Ms. Brown said no, clarifying that she had just begun her recording. Officer Correll requested a copy of the video, which was understood by Ms. Brown as directive for her to continue her recording, since Officer Correll had said to her, "Yeah, if you would." The first officer then left to rejoin the other officers. [*Id.*, at 0:42-1:23].

As police officers' were engaged in defining the perimeter of the apprehension scene by installing the crime scene tape, Ms. Brown and Ms. Lipscomb remained standing outside that circumscribed space. Officer Robinett concedes that this was true, but testified that he remained concerned that they were too close because of their proximity to the still-combative suspect. In addition, Officer Robinet knew that the suspect had been armed moments before his arrest and that his weapon had not yet been located or secured. Around approximately the same time, blood had been observed by officers on the ground in a place just south of where the crime scene tape had been erected, which led Officer Robinett to believe that the crime scene was potentially wider than had been initially been determined. Indeed, that expansion later occurred so that the

area circumscribed by the tape encompassed the area in which Ms. Brown and Ms. Lipscomb had been standing. [Robinett Depo, at p. 10-12; Robinett Interrogatory, p. 8].

Based on these events and Officer Robinett's concerns, he approached Ms. Brown and Ms. Lipscomb approximately two minutes after the first unnamed officer had instructed them to "back up," and ordered them "to leave please." [Brown Video at 3:18-20]. As previously stated, all of these events and spoken exchanges between Officer Robinett and Ms. Brown were captured on video.[3]

The video reveals that, in response to Officer Robinett's directive, Ms. Brown protested that she was permitted to remain in that area in light of Officer Correll's request that she record what was occurring. Officer Robinett replied, "no," but was interrupted by Ms. Brown, who said, "Your Officer did. Your Officer did." Officer Robinett attempted to explain, saying, "I understand. But, so, yes we have crime scene tape up. But he ran. We don't know where exactly. And we suspect there might be a gun out. So we suspect that you might be in the crime scene." Ms. Brown appeared to understand. When Officer Robinett reiterated his reasons to Ms. Brown—that the officers "need her to leave please"—Ms. Brown resisted, requesting of Officer Robinett that he "check with [his] officer because he said this footage is important." Officer Robinett replied that, though

---

[3] Ms. Brown has advanced several assertions that are either unsupported entirely or contradicted by record evidence. For example, she claims that officers on the scene were "standing nonchalantly around the scene" and "not concerned about the presence of an outstanding weapon," and that Officer Robinett never attempted to gather information regarding the crime scene from other officers. These characterizations, quite apart from their other evidentiary weaknesses, have not been persuasively developed in Ms. Brown's legal analysis. We shall not include them in our analysis either.

the video footage may prove helpful, "[the suspect is] being transported . . . He is getting medical attention." Officer Robinett remarked that he was "concerned," but his statement to Ms. Brown was interrupted by her inquiry as to whether the man (suspect) was alive. Officer Robinett confirmed that the suspect was alive and also commented that the officers "don't know where the gun is yet," so Ms. Brown and Ms. Lipscomb "need to leave" the area to allow the officers to "start searching for the gun after [they] tend to him." Ms. Brown replied, "Okay, I'll keep recording and back up until you told [*sic*] me that cop . . . go ask him if he wants me to stop because I'm cold and I'd like to stop." Officer Robinett stated again that "[she] may be in the crime scene," which officers are still in the process of identifying. [Brown Video, 3:21-4:10].

Ms. Lipscomb finally acquiesced in Officer Robinett's orders and agreed to return to her vehicle. Officer Robinett directed Ms. Brown to also return to the vehicle, but she remained in place, adamant that "the officers already told [her she was fine]" and suggesting that Officer Robinett needed to speak to his "superior." Officer Robinett responded, saying, "No, no, no. I'm telling you right now this is not okay." Ms. Brown again insisted that Officer Robinett speak to his superior, but Officer Robinett again ordered Ms. Brown to back away from the crime scene. [*Id.* at 4:10-4:24; Robinett Depo., at 13].

Officer Robinett tried again to secure Ms. Brown's compliance with his order. He introduced himself and attempted to explain to Ms. Brown that she was located within the crime scene and needed to move. Ms. Brown's shouted in response, saying, "But you're not understanding. You need, we would listen, we were already told by an officer

already." Officer Robinett attempted again to persuade Ms. Brown to leave, saying, "Okay, I am an officer as well and I'm telling you that they are misinformed. We have not identified the crime scene. You guys need to back up. You are standing in a . . ." Ms. Brown interrupted, "Sir, that's not . . . that's a lie. That's not what he just said on video." When Officer Robinett asked Ms. Brown if she knew what happened, she replied that she did not care. [Brown Video, at 4:23-4:58].

Officer Robinett continued to tell Ms. Brown that she was standing in a crime scene and that she needed to "back up," and Ms. Brown continued to shout that she is doing what the officer instructed her to do and that Officer Robinett needed to speak to his superior. Officer Robinett informed Ms. Brown that the officer to whom she was referring was currently on the phone, and he continued to insist that she remove herself from the crime scene. Ms. Brown then quipped that Officer Robinett should "stop trying to be the shot guy." [*Id.* at 4:56-5:10].

This impasse came to a head when Officer Robinett, who was unable to convince Ms. Brown to comply with his order to move out of the crime scene, said, "Okay, we're not going to wait any longer. Go sit in your car. He will come talk to you." Ms. Brown did not do so, insisting instead that Officer Robinett call his lieutenant. After informing Ms. Brown that his lieutenant was still tied up. Ms. Brown began shouting that she had a right to be where she was. Officer Robinett protested that she did not have a right to be "in [his] crime scene." [*Id.* at 5:10-5:38].

This entire exchange between Officer Robinett and Ms. Brown unfolded over the course of something less than two and half minutes.

7

When Ms. Brown continued to persist in her refusal to comply with Officer Robinett's order to leave, the Officer approached her to place her under arrest, whereupon Ms. Brown told Robinett not to touch her and shouted, "Sir! Lieutenant! We were given orders to record! Please come and help!"  The video footage records that Officer Robinett placed his left hand on Ms. Brown's left arm and his right hand on her back and directed her to "come over here." Ms. Brown pulled away from him, still shouting for help and demanding that Officer Robinett not touch her. When Officer Robinett attempted to place Ms. Brown's arms behind her back to handcuff her, she extricated her left arm in order to pass her phone to Ms. Lipscomb.[4] Officer Robinett took hold of her left arm as Ms. Brown was pulling her right arm away so she could place a cigarette in her mouth.  She continued to physically resist Officer Robinett's efforts to secure custody of her, yelling loudly that he was "out of place." Officer Robinett eventually succeeded in placing handcuffs on Ms. Brown and placed her in a seated position on the ground. Officer Robinett then walked away to inquire of the other officers if they had found the missing weapon. Though their responses are not audible on the video, Officer Robinett can be heard to have said,  "Okay, so it is an active crime scene." [*Id.* at 5:38-7:02; Lipscomb Video at 5:34-6:19].

Ms. Brown was in custody and restrained for a total of fifty-two seconds before Officer Robinett removed the handcuffs to allowed her to return to her vehicle.  Officer

---

[4] Though Ms. Lipscomb's video camera briefly pans away from Officer Robinett and Ms. Brown during the outset of their physical encounter, it captured most of the struggle that ensued between them.

Robinett has testified that he believed he had probable cause to arrest Ms. Brown for refusing to leave an emergency incident area, for refusing to aid a police officer, for disorderly conduct, and for resisting law enforcement.

Ms. Brown's lawsuit seeks to hold Officer Robinett personally liable for violating her "Fourth Amendment right not be subjected to unreasonable search and seizure and her First Amendment right to record the police."

## <u>Analysis</u>

### I.   **Standard of Review**

Summary judgment is appropriate where there are no genuine disputes of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). A court must grant a motion for summary judgment if it appears that no reasonable trier of fact could find in favor of the nonmovant on the basis of the designated admissible evidence. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986). We neither weigh the evidence nor evaluate the credibility of witnesses, *id.* at 255, but view the facts and the reasonable inferences flowing from them in the light most favorable to the nonmovant. *McConnell v. McKillip*, 573 F. Supp. 2d 1090, 1097 (S.D. Ind. 2008).

### II.   **Officer Robinett is Entitled to Summary Judgment on Ms. Brown's Fourth Amendment Claim Against Him**

The Fourth Amendment protects "[t]he right of the people to be secure in their persons . . . and effects, against unreasonable searches and seizures[.]" U.S. Const. amend. IV. The touchstone of the Fourth Amendment is reasonableness under all the

circumstances, *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006), limned by balancing the public and private interests at stake in a given state intrusion into personal privacy. *United States v. Hensley*, 469 U.S. 221, 228 (1985). Here, Ms. Brown alleges that Officer Robinett unreasonably seized her by placing her in handcuffs at the crime scene when she allegedly properly resisted his directive to step back and into a less important space.[5]

In analyzing the constitutionality of Fourth Amendment seizures, police-citizen interactions are divided into three types. *United States v. Johnson*, 910 F.2d 1506, 1508 (7th Cir. 1990) (citing *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982)). Under this framework, progressively deeper intrusions into a citizen's privacy interests require progressively weightier justifications. *See id.* Consensual encounters over which police exercise no control, which are therefore not Fourth Amendment seizures at all, require no particularized suspicion to justify them. *Id.* Investigatory stops, or *Terry* stops, which are limited to brief, nonintrusive detentions require reasonable suspicion of criminality supported by specific, articulable facts. *Id.* Full arrests subjecting an arrestee to a litany of intrusions, *see Utah v. Streiff*, 136 S. Ct. 2056, 2070 (2016) (Sotomayor, J., dissenting), require probable cause to believe the person is committing or has recently committed a crime. *Johnson*, 910 F.2d at 1508.

The parties stipulate that Officer Robinett effected an arrest when he handcuffed Ms. Brown. The requisite quantum of suspicion for arrests is probable cause.

---

[5] Ms. Brown has not alleged any Fourth Amendment violations arising from her interactions with Officer Robinett prior to his placing her in handcuffs.

"Probable cause exists if at the time of the arrest, the facts and circumstances within the officer's knowledge are sufficient to warrant a prudent person, or one of reasonable caution, in believing, in the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense." *Ramos v. City of Chicago*, 716 F.3d 1013, 1018 (7th Cir. 2013) (*internal quotations omitted*). Determinations of probable cause are mixed questions of fact and law, but when the facts are undisputed, the ultimate resolution of whether probable cause or reasonable suspicion existed becomes a question of law. *United States v. Carlisle*, 614 F.3d 750, 754, 2010 WL 3155876 (7th Cir. 2010).

Officer Robinett has testified that he believed he had probable cause to arrest Ms. Robinett based on her refusal to follow his order to step outside an emergency incident area, for her refusal to assist an officer, for her disorderly conduct, and for resisting her arrest. His legal analysis is grounded in the doctrine of qualified immunity, according to which, he contends, that, regardless of whether probable cause existed, he is shielded from liability for Ms. Brown's Fourth Amendment claim against him.

Based on our thorough analysis of the facts of this case and the applicable legal principles, we agree that Office Robinett is entitled to qualified immunity on Ms. Brown's Fourth Amendment claim.

"Qualified immunity protects public officials from liability for damages if their actions did not violate clearly established rights of which a reasonable person would have known." *Fleming v. Livingston Cnty., Ill.*, 674 F.3d 874, 879 (7th Cir.2012). In this context, qualified immunity protects officers who have "arguable probable cause" to

arrest. In other words, it shields those officers who reasonably but mistakenly believe probable cause existed. *Gutierrez v. Kermon*, 722 F.3d 1003, 1008, 2013 WL 3481359 (7th Cir. 2013) ("An arrest without probable cause is a violation of a constitutional right, whereas an arrest without arguable probable cause is a violation of a clearly established constitutional right."). Arguable probable cause exists when "a reasonable police officer in the same circumstances as the officer in question *could* have reasonably believed that probable cause existed in light of well-established law." *Humphrey v. Staszak*, 148 F. 3d 718, 725 (7th Cir. 1998).

We need not review all of Officer Robinett's purported justifications for his arrest of Ms. Brown, because we have little trouble concluding that Officer Robinett had, at a minimum, arguable probable cause to arrest Ms. Brown for her refusal to leave the emergency incident area.[6]

Under Indiana law, "[a] person who is not a firefighter who knowingly or intentionally refuses to leave an emergency incident area after being requested to do so by a firefighter or law enforcement officer commits a Class A misdemeanor." Ind. Code. § 35-44.1-4-5. Though there is a dearth of case law interpreting this statute, our court has previously determined that there are three elements of this offense; a person violates § 35-44.1-4-5 if: 1) she is not a firefighter, (2) she refuses to leave an emergency incident

---

[6] Tucked into Officer Robinette's qualified immunity defense is his passing reference to the fact that he possessed probable cause to arrest Ms. Brown based on her refusal to leave the emergency incident area. However, this assertion has not been supported by *any* analysis in his motion or his briefing of that motion. He has contented himself simply to invoke an entitlement to qualified immunity. We do not resolve the probable cause issue, therefore, because Officer Robinette has not clearly asserted this defense.

area immediately after being requested to do so by a firefighter or law enforcement officer, and (3) she acts knowingly or intentionally. *Simpson v. City of Indianapolis*, 2017 WL 106434, 1:13-cv-00791-RLY-TAB, at *4 (S.D. Ind. Jan. 11, 2017). In view of the factual contours of the dispute before us, we shall divide the second element into two, to wit, that the individual must refuse to leave the subject area following an order by an officer to do so *and* that the subject area satisfies the statutory definition of "emergency incident area."

Here, there is no dispute that Ms. Brown was not a firefighter at the time of her arrest nor that she knowingly and intentionally refused to leave the area following Officer Robinett's orders to do so. The parties' only factual disagreement concerns the remaining element: whether Ms. Brown was located in an "emergency incident area" when she refused to leave.

An "emergency incident area" is an area that:

(1) is
    (A) defined by police or firefighters with flags, barricades, barrier tape, or other markers; or
    (B) one hundred and fifty (150) feet in all directions from the perimeter of the emergency incident; *whichever is greater*; or

(2) is a specific distance less than one hundred and fifty (150) from all directions from the perimeter of the emergency incident that is articulated by a law enforcement officer.

Ind. Code § 35-44.1-4-2 (emphasis added).

Pursuant to Ind. Code § 35-44.1-4-1.5(4), an "emergency incident" is, among other things, a "crime scene," that is, "the location where a crime was committed" and where an investigation is ongoing. *See Tapp v. State*, 134 N.E.3d 80 (Ind. Ct. App. 2019).

Officer Robinett argues that his belief that the crime scene (i.e., the emergency incident) extended, at minimum, to the area identified by the crime scene tape was reasonable. If this belief is shown to be reasonable, then, pursuant to § 35-44.1-4-2(1)(B), the "emergency incident area" was the area that was 150 feet from all directions from the perimeter of the crime scene tape, which area encompassed where Ms. Brown was standing. Officer Robinett thus contends that he acted reasonably in concluding that Ms. Brown was refusing to leave the "emergency incident area."

Once a qualified immunity defense is raised, the burden shifts to the plaintiff to overcome it, if she can, by "identifying a closely analogous case or by persuading the court that the conduct is so egregious and unreasonable that, notwithstanding the lack of an analogous decision, no reasonable officer could have thought he acting lawfully. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 723 (7th Cir. 2013); *Betker v. Gomez*, 692 F.3d 854, 860 (7th Cir. 2012).

Ms. Brown has accomplished neither of these showings, choosing to submit instead what were disorganized, undeveloped legal theories that sidestepped each of the material issues in dispute. Indeed, Ms. Brown has had *nothing* at all to say in response to Officer Robinett's qualified immunity defense to her Fourth Amendment claim. This

procedural default alone entitles Officer Robinett to qualified immunity.[7] *See Abbott*, 705

F.3d at 723. [8]

---

[7] We note that Officer Robinett's analysis of his qualified immunity doctrine in his opening brief is sparse at best, relying on boilerplate phrases and broad statements of legal principles relating to the Fourth Amendment and the qualified immunity doctrine, on the basis of which in conclusory fashion he asserts that he is entitled to qualified immunity. Not until his reply brief does he develop his legal theory. Clearly, an entitlement to qualified immunity cannot be established by the mere incantation of magic words, purportedly buttressed by endless pages of quotes relating to the doctrine. Arguably, Ms. Brown was entitled to an opportunity to submit a surreply in response to the arguments first developed in Officer Robinett's reply to point out these deficiencies in Officer Robinett's brief. But Ms. Brown failed to raise these arguments. Had she done so, we likely would have granted her request. She has not, and we will not craft arguments for her. Whether her arguments against qualified immunity would have carried the day, however, remains unlikely based on our own analysis.

[8] Ms. Brown, in fact, has presented only a minimal rebuttal to Officer Robinett's motion for summary judgment on this claim. Her primary argument is that no probable cause existed to arrest her, though her precise legal theory is not so easily identified. From what we can discern, Ms. Brown believes that § 35-44.1-4-2(2), which provides that the emergency incident area "is a specific distance less than one hundred and fifty (150) from all directions from the perimeter of the emergency incident that is articulated by a law enforcement officer" governs the analysis. Specifically, she contends that Officer Correll (the officer who requested a copy of Ms. Brown's video), determined that the emergency incident area was the area within the crime scene tape because "he was looking directly at her as he was stringing crime scene tape and instructing [her] to keep recording." This theory lacks any legal support, however, on which to base a finding that Officer Correll's actions qualify an "articulation" of the "specific" perimeter of the emergency incident area. Even if that were a valid theory, Ms. Brown cannot prevail on her false arrest claim, given her complete failure to respond to Officer's Robinett's qualified immunity defense. Ms. Brown's brief is dotted with other legal assertions that lack any relevance or connection to the law and evidence before the court. For example, she asserts that a determination of her false arrest claim hinges on whether Officer Robinett arrested her "for the reasons stated" or rather "because he simply wished to find a vehicle to exclude public observance of the police," which, she says, is a question that must be resolved by a jury. The only apparent basis for this argument is Ms. Brown's personal theorizing. Officer Robinett's motivations are entirely irrelevant to the legal issue of whether he violated her Fourth Amendment rights. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014) (stating well-established rule that an officer's subjective motivations are not considered in determining if probable cause existed); *Harrell v. Cook*, 169 F.3d 428, 431 (7th Cir. 1999) ("Qualified immunity depends on the objective legal reasonableness of the defendants' actions, not on their subjective motivations."). Her remaining arguments are similarly flawed and do not warrant further review by the court, particularly in light of her complete failure to address Officer Robinett's qualified immunity defense.

Moreover, we concur in Officer Robinett's belief that he did possess arguable probable cause to arrest Ms. Brown for refusing to leave the emergency incident area.

As set forth in § 35-44.1-4-2, the emergency incident area is the greater of two measurements: either the area "defined by police or firefighters with flags, barricades, barrier tape, or other markers" or 150 feet in all directions from the perimeter of the "emergency incident." Here, the relevant "emergency incident" was the "crime scene," which term is undefined in the statute and unaddressed by Indiana courts in interpreting § 35-44.1-4-5. Accordingly, qualified immunity is available to Officer Brown to shield him from liability so long as his interpretation of this undefined term was reasonable. *Thayer v. Chiczewski*, 705 F.3d 237, 247 (7th Cir. 2012).

Ms. Brown does not dispute the reasonableness of Officer Robinett's statutory interpretation. Nor does she contend that he was erroneous in his belief that the crime scene tape established the perimeter of the crime scene. Our review of the caselaw discloses no court holding establishing that a police officer acts unreasonably in assuming that a "crime scene" encompasses the entire area that has been segregated off by law enforcement officers as part of their efforts to investigate crimes, secure evidence, and detain suspects.[9] Thus, we conclude as well that Officer Robinett reasonably believed

---

[9] We reject Ms. Brown's contention that Officer Robinett did not have personal knowledge of "what comprised the emergency incident scene" because he did not arrive until the suspect was apprehended. This assertion is nonsensical; there can be no dispute that Officer Robinett had personal knowledge, at the time of Ms. Brown's arrest, that a weapon was missing following the apprehension of a suspect; that, immediately preceding his apprehension, the suspect had been running through the streets surrounding the apprehension scene; that there was blood on the pavement beyond the perimeter of the crime scene tape; and that law enforcement officers were in the process of identifying and securing the crime scene when Ms. Brown arrived. The fact that Officer Robinett learned pieces of this information through discussion with other officers,

16

that the "crime scene," and correspondingly the "emergency incident," extended to include the area encompassed by the crime scene tape.

We further conclude that, if Officer Robinett's belief was reasonable, it was also reasonable for him to conclude that, under § 35-44.1-4-2, the emergency incident area was 150 feet from all directions of the crime scene tape. We note again that Ms. Brown has not objected to the reasonableness of this interpretation, nor has she identified (or the Court located) any cases contradicting Officer Robinett's interpretation. Additionally, the video evidence establishes clearly, indeed, beyond dispute, that Ms. Brown was within 150 feet from the crime scene tape at all times during her interactions with Officer Robinett.[10]

---

whether through radio dispatch or face-to-face communications, is immaterial. *Torry v. City of Chicago*, 932 F.3d 579, 586 (7th Cir. 2019); *United States v. Hayden*, 353 Fed. Appx. 55, 57, 2009 WL 4072078, at *2 (7th Cir. 2009).

[10] Ms. Brown asserts that "there is no evidence in the record of the precise distance between the emergency incident and the location Ms. Brown occupied." This assertion is presented without any effort by Ms. Brown to navigate the statutory framework of Ind. Code § 35-44.1-4-2. Additionally, though "the precise distance" between Ms. Brown and the crime scene tape may not be set forth in the evidence, Ms. Brown has not argued that Officer Robinette was unreasonable in his estimations that she was within 150 feet of the crime scene tape. Moreover, no reasonable juror could review the video evidence and conclude that Ms. Brown was more than 150 feet from the crime scene tape when she refused to follow Officer Robinett's directives to leave. Rather, for the duration of this exchange leading up to her arrest, she appears to be standing directly behind the crime scene tape. By Officer Robinett's personal estimate, to which she has not objected, this tape is approximately 15 feet from the location where the suspect had been apprehended and was receiving medical care. We note as well that Ms. Brown has requested that we take judicial notice of the map of the street on which her arrest occurred. While doing so does not enable us to determine the precise distance from the location of the suspect's apprehension to the crime scene tape, Google Maps nonetheless establishes that the suspect's apprehension was approximately 50 feet from where Officer Robinett first attempted to restrain Ms. Brown, and, at most, 120 feet from where she was ultimately handcuffed. *Cloe v. City of Indianapolis*, 712 F.3d 1171, 1177, 2013 WL 1405428 (7th Cir. 2013), *overruled on other grounds by Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760 (7th Cir. 2016) ("We have taken judicial notice of—and drawn our distance estimates from—images available on Google Maps, a source whose accuracy cannot reasonably be questioned, at least for the purpose of determining

We thus hold that Officer Robinett reasonably concluded at the time of Ms.

Brown's arrest that she was located within the "emergency incident area" when she, a

non-firefighter, knowingly and intentionally refused to immediately leave despite Officer

Robinett's directives to do so. Accordingly, Officer Robineet had arguable probable cause

to arrest her for refusing to leave the emergency incident area in violation of Ind. Code. §

35-44.1-4-5 and is entitled to qualified immunity on the Fourth Amendment claim against

him. Summary judgment shall enter in Officer Robinett's favor on this claim by Ms.

Brown.

### III.    Officer Robinett is Entitled to Summary Judgment on Ms. Brown's First Amendment Claim Against Him

Ms. Brown alleges that Officer Robinett violated her First Amendment "right to

record police" when he forced her to stop recording the crime scene on February 26,

2019. To prevail on her First Amendment claim against Officer Robinett, Ms. Brown

must establish that: "(1) [she] engaged in activity protected by the First Amendment; (2)

[she] suffered a deprivation that would likely deter First Amendment activity; and (3) the

First Amendment activity was at least a motivating factor in the police officer's decision."

*Thayer v. Chiczewski*, 705 F.3d 237, 251 (7th Cir. 2012).

There is no dispute that Ms. Brown undoubtedly suffered a "deprivation" by virtue

of her arrest, thus satisfying the second element of her First Amendment retaliation claim.

*Hudkins v. City of Indianapolis*, 2015 WL 4664592, at *15 (S.D. Ind. Aug. 6, 2015)

---

general distances.") (internal quotations omitted). Accordingly, there can no dispute that Ms.
Brown was within the area that Officer Robinett reasonably identified as the "emergency
incident area."

(citing *Thayer*, 705 F.3d at 251). Additionally, with respect to the first element, the parties agree that the First Amendment broadly protects the right to record policy activity. *Id.*; *Am. Civil Liberties Union : of Illinois v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012).

The parties also agree that this broad protection of the right to record is not absolute. In an order preliminarily enjoining an Illinois statute which criminalized the recording of police in public places, the Seventh Circuit explained that:

> It goes without saying that the police may take all reasonable steps to maintain safety and control, secure crime scenes and accident sites, and protect the integrity and confidentiality of investigations. While an officer surely cannot issue a "move on" order to a person because he is recording, the police may order bystanders to disperse for reasons related to public safety and order and other legitimate law-enforcement needs . . . Nothing we have said here immunizes behavior that obstructs or interferes with effective law enforcement or the protection of public safety.

*Alvarez*, 679 F.3d at 607. Accordingly, it is beyond debate that an officer acts within constitutional boundaries when he demands that a bystander/citizen engaged in recording a particular scene depart from the area when there is a need to secure public safety or to protect the integrity of a crime scene. *See id.* We move, therefore, to consider the third element of Ms. Brown's First Amendment retaliation claim, that is, whether Officer Robinett's decision to arrest her was motivated by her engagement in the protected First Amendment activity.

The Seventh Circuit has prescribed a burden-shifting framework to guide our analysis of this element. Pursuant to this framework, a plaintiff first must "show that a violation of his First Amendment rights was a 'motivating factor' of the harm he's complaining of." *Thayer*, 705 F.3d at 251. If the plaintiff succeeds in making such a

prima facia showing, "the burden shifts to the defendant to show that the harm would have occurred anyway." *Id.* "Once a defendant produces evidence that the same decision would have been made in the absence of the protected speech, the burden shifts back to the plaintiff to demonstrate that the proffered reason was pretextual and that the real reason was retaliatory animus." *Id.* at 252. On summary judgment, this means that a plaintiff must produce specific evidence upon which a reasonable juror could infer that the defendant's proffered reason for the harm to plaintiff was a lie. *Id.*

Officer Robinett bypasses this framework in his analysis, going instead directly to the issue of whether qualified immunity shields him from liability.

Our analysis of this claim need not be protracted because it is abundantly clear that Officer Robinett is entitled to qualified immunity on this claim against him as well.[11]

As previously stated, "[q]ualified immunity shields government officials from civil damages liability unless the official violated a statutory or constitutional right that was clearly established at the time of the challenged conduct." *Id.* at 252. A clearly established right is one that is sufficiently clear such that "every reasonable official would have understood that what he is doing violates that right." *Id.*

In considering qualified immunity in circumstances similar to those before us, the Seventh Circuit has directed that, even if there is evidence establishing that an arrest was retaliatory and in violation of the First Amendment, qualified immunity shields an officer

---

[11] Nor do we need to engage in any further review of Ms. Brown's speculative, conclusory, and unsubstantiated theories.

from liability so long as the officer had arguable probable cause for the arrest.[12] *Id.* at 253. As the Seventh Circuit has explained, neither the Supreme Court nor the Seventh Circuit has ever recognized a clearly established First Amendment right to be free from a retaliatory arrest that is supported by arguable probable cause. *Id.* (finding that Supreme Court's holding that the existence of probable cause shielded arresting officer from individual liability extended to instances where the arrest was supported by arguable probable cause). From our thorough review, such a clearly established right remains unrecognized. Accordingly, having previously determined that arguable probable cause existed for her arrest, we hold that Officer Robinett is entitled to qualified on immunity on Ms. Brown's First Amendment retaliation claim.

    In any event, Ms. Brown has entirely failed to proffer any evidence in support of a reasonable inference that Officer Robinett acted with retaliatory animus in arresting her. For example, Ms. Brown's act of recording the crime scene was never met with instantaneous shows of force against her by Officer Robinett. Officer Robinett, so far as we have been informed, has never acted to prevent citizens from recording law enforcement officers. There is no evidence to show that his communications with Ms. Brown conveyed his purpose or intent that she could stay in the protected area if she

---

[12] Though Officer Robinett has stopped short of making the case that probable cause existed for the arrest, we note that a finding of probable cause forecloses any First Amendment retaliation claims against him. *Lund v. City of Rockford, Illinois*, 956 F.3d 938, 944 (7th Cir. 2020) ("[P]robable cause defeats a claim of retaliatory arrest . . . No further analysis of causation, motive, or injury is required.") (citing *Nieves v. Bartlett*, ––– U.S. –––, 139 S. Ct. 1715, 1727, 204 L.Ed.2d 1 (2019)).

stopped recording, nor did he ever, in fact, express any frustrations or concerns to her or anyone else arising from the fact she was recording the crime scene. Rather, he simply stated and then reiterated numerous times to her his concerns regarding her proximity to the crime scene in light of the missing weapon. His only request of her throughout this encounter was that she continue her observations from a further distance away from the crime scene. Only when she repeatedly refused to follow his directives, despite repeated cautions about the outstanding weapon and the scope of the crime scene, did Officer Robinett arrest Ms. Brown. On these facts, no reasonable juror could find in favor of Ms. Brown on her First Amendment claim. *Compare Thayer v. Chiczewski,* 2010 WL 1336537, at *7 (N.D. Ill. Mar. 31, 2010), *aff'd in relevant part*, 705 F.3d 237 (7th Cir. 2012) *with Hudkins v. City of Indianapolis,* 2015 WL 4664592, at *15 (S.D. Ind. Aug. 6, 2015); *Kozel v. Vill. of Dolton*, 804 F. Supp. 2d 740, 744 (N.D. Ill. 2011*); Bass v. Hansen*, 2010 WL 5069690, at *14 (N.D. Ill. Dec. 7, 2010); *Baldauf v. Davidson*, 2007 WL 1202911, at *5 (S.D. Ind. Apr. 23, 2007), *review granted, decision modified*, 2007 WL 2156065 (S.D. Ind. July 24, 2007).

Accordingly, we hold that Officer Robinett is entitled to summary judgment on Ms. Brown's First Amendment claim against him.

## **CONCLUSION**

Defendant's Motion for Summary Judgment [Dkt. 47] is **granted.** Final judgment shall enter by separate order.

IT IS SO ORDERED.


Date:   _____2/19/2021_____

SARAH EVANS BARKER, JUDGE
United States District Court
Southern District of Indiana

Distribution:

Traci Marie Cosby
OFFICE OF CORPORATION COUNSEL
tmcosby@widener.edu

Andrew R. Duncan
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT,  LLP
ard@rkblegalgroup.com

Anne Celeste Harrigan
OFFICE OF CORPORATION COUNSEL
anne.harrigan@indy.gov

John F. Kautzman
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT,  LLP
jfk@rkblegalgroup.com

Terrance Lamont Kinnard
KINNARD & SCOTT
tkinnard@kinnardlaw.net

Edward J. Merchant
RUCKELSHAUS KAUTZMAN BLACKWELL BEMIS DUNCAN & MERCHANT,  LLP
ejm@rkblegalgroup.com

Andrew J. Upchurch
OFFICE OF CORPORATION COUNSEL
andrew.upchurch@indy.gov